UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Paul Viko,                          :
Plaintiff,                          :
                                    :
v.                                  :   No. 2:08-cv-221
                                    :
World Vision, Inc. and              :
World Vision International,          :
Defendants.                         :


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
(Docs. 5 & 26)


Presently before the Court is Defendants' joint motion to dismiss. The Defendants move to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, under 12(b)(3) for improper venue, and under the common law doctrine of *forum non conveniens*. Fed. R. Civ. P. 12(b)(2); 12(b)(3). (Doc. 5). In the alternative, both Defendants move to transfer this matter pursuant to 28 U.S.C. § 1404(a) or § 1406(a). (Doc. 26).[1] For the reasons stated below, I recommend that the Defendants' motion to dismiss be DENIED, but that their motion to transfer this matter to the Central District

---

[1] Initially, the Defendants also moved to dismiss under Rules 12(b)(4) and 12(b)(5) for insufficient process and insufficient service of process respectively. (Doc. 5 at 1). In response, Plaintiff Viko cross-moved to correct service. (Doc. 10). In a separate Order, the Court denied Viko's motion as moot (Doc. 21), and now recommends that Defendants' 12(b)(4) and 12(b)(5) motions be denied as moot as well.

1

of California be GRANTED.

## **Background**

For purposes of the motion to dismiss, all facts taken from Viko's pleadings are assumed to be true and all inferences are drawn in Viko's favor. Plaintiff Paul Viko is a retired Vermont resident who conducts international development work abroad. (Doc. 9 at 1). Defendants World Vision, Inc. and World Vision International are two elements of the "World Vision Partnership," a non-profit humanitarian organization that provides relief and development assistance in approximately 90 countries.[2] (Doc. 9 at 2; Doc. 5 at 1). World Vision, Inc. (WV, Inc.) is a California corporation with its principal place of business in Federal Way, Washington, and World Vision International (WV Int'l) is incorporated in California with its principal place of business in Monrovia, California. (Doc. 5 at 1).

In March 2006 Viko traveled to the African nation of Mozambique where he had been hired by International Executive Service Corps ("IESC") to give seminars on

---

[2]    Hereinafter, this opinion shall refer to WV, Inc. and WV Int'l collectively as "World Vision."

business planning. IESC arranged for World Vision to host his seminars and to manage the logistics of his assignment, including transportation. (Doc. 9-2 at 1).

On March 25, 2006 Viko was a passenger in a motor vehicle operated by WV Int'l employee Carlitos Impada when Impada lost control of the vehicle and an accident occurred. The accident fractured Viko's spine in two locations. Viko was initially transported from Mozambique to Johannesburg, South Africa for medical care, and later received further treatment in Richmond, Virginia before being able to return to Vermont approximately five months after the accident. (Doc. 9 at 1-2).

On October 16, 2008 Viko filed the instant action, alleging that both WV, Inc. and WV Int'l are liable on the basis of *respondeat superior* as well directly liable for the negligent hiring and training of Mr. Impada.

## Discussion

### I. Personal Jurisdiction

#### A. Legal Standard

On a 12(b)(2) motion to dismiss the plaintiff

bears the burden of demonstrating contacts with the forum state that are sufficient to give the court jurisdiction over the person of the defendant. <u>Country Home Products, Inc. v. Schiller-Pfeiffer, Inc.</u>, 350 F. Supp. 2d 561, 566-67 (D. Vt. 2004). However, prior to discovery or an evidentiary hearing on the issue, the plaintiff need only make a *prima facie* showing that jurisdiction exists, and this "remains true notwithstanding a controverting presentation by the moving party." <u>Hoffritz for Cutlery, Inc. v. Amajac, Ltd.</u>, 763 F.2d 55, 57 (2d Cir. 1985); <u>see also</u> <u>Real Good Toys, Inc. v. XL Machine Ltd.</u>, 163 F. Supp. 2d 421, 423 (D. Vt. 2001). Finally, "in the absence of an evidentiary hearing on the jurisdictional allegations, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to the plaintiff," and all inferences are drawn in the plaintiff's favor. <u>Hoffritz</u>, 763 F.2d at 57.

Personal jurisdiction analysis consists of a two-part inquiry. First, the district court must determine whether the law of the state in which it sits would permit personal jurisdiction over the defendant.

4

<u>Bensusan Rest. Corp. v. King</u>, 126 F. 3d 25, 27 (2d Cir.

1997); <u>Country Home Products</u>, 350 F. Supp. 2d at 567.

Second, the court must determine whether the due

process requirements of the Fourteenth Amendment

preclude the exercise of personal jurisdiction over the

defendant.  <u>Country Home Products</u>, 350 F. Supp. 2d at

567; <u>see</u> <u>also</u> <u>International Shoe Co. v. State of

Washington</u>, 326 U.S. 310, 316 (1945).  In Vermont,

however, courts have interpreted the relevant statute,

12 V.S.A. § 913(b), to permit personal jurisdiction

over a defendant to the "outer limits of the due

process clause."  <u>Sollinger v. Nasco Int'l, Inc.</u>, 655

F. Supp. 1385, 1387 (D. Vt. 1987) (citations omitted).[3]

Thus the two inquiries merge, and the only question to

be asked here is whether the exercise of personal

jurisdiction over the defendant comports with the

requisites of due process.

In order for a court's assertion of personal

jurisdiction to comply with due process it must conduct

---

[3]    Vt. Stat. Ann. tit. 12 § 913(b) states that: "Upon the service,
*and if it appears that the contact with the state by the party or the
activity in the state by the party or the contact or activity imputable
to him is sufficient to support a personal judgment against him*, the
same proceedings may be had for a personal judgment against him as if
the process or pleading had been served on him in the state."  (Emphasis
added).

both a "minimum contacts" inquiry and a "reasonableness" inquiry. <u>Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 567 (2d Cir. 1996). To determine whether a defendant has made the "minimum contacts" with the forum state necessary for personal jurisdiction to attach, courts must first distinguish between "specific" and "general" jurisdiction. <u>Id.</u> at 567. "Specific jurisdiction exists when 'a state exercises personal jurisdiction over a defendant in a suit arising out of or relating to the defendant's contacts with the forum,'" while general jurisdiction "is based on the defendant's general business contacts and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." <u>Id.</u> at 567-68 (quoting <u>Helicopteros Nacionales de Columbia, S.A. v. Hall</u>, 466 U.S. 408, 414-416, nn.8-9 (1984)). Courts impose a "more stringent" minimum contacts test for general jurisdiction, requiring the plaintiff to show that the "defendants' general business contacts with Vermont were continuous, systematic and of a sufficiently substantial nature as to permit a Vermont

court to entertain a cause of action." Bechard v. Constanzo, 810 F. Supp. 579, 583 (D. Vt. 1992); see also Perkins v. Benquet Consol. Mining Co., 342 U.S. 437, 446 (1952) (explaining that a court may assert general jurisdiction over a foreign defendant only when the "continuous corporate operations within a state [are] thought so substantial and of such nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."). To be sufficient, these contacts must be the result of intentional and affirmative action by the defendant itself. Id. at 585; Pasquale v. Genovese, 136 Vt. 417, 421 (1978).

Once the requisite minimum contacts are established, the reasonableness inquiry requires the court to determine that an assertion of personal jurisdiction does not offend "'traditional notions of fair play and substantial justice.'" Tom and Sally's Handmade Chocolates, Inc., 977 F. Supp. 297, 300 (D. Vt. 1997); Metropolitan Life, 84 F.3d at 568. To make this finding courts looks at "1) the burden on the defendant; 2) the forum State's interest in

adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and 5) shared interest of the several States in furthering fundamental substantive social policies." <u>Country Home Products</u>, 350 F. Supp. at 568 (citing <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 477 (1985)).

## B. Personal Jurisdiction Over World Vision

As an initial matter, it is plain that this suit does not permit a finding of specific jurisdiction over World Vision, and Viko apparently does not dispute this assertion. (Doc. 9 at 6). This case arises out of alleged facts that took place in Mozambique and are thus completely unrelated to any contacts World Vision may have with Vermont.

Instead, Viko puts forth two arguments to show that both World Vision entities are subject to the general in personam jurisdiction of this Court. First, Viko contends that WV, Inc. consented to the general jurisdiction of Vermont's courts by registering to do business here and appointing a registered agent to

accept service of process. (Doc. 22 at 1-5). Since

consent to jurisdiction can itself satisfy due process,

Viko argues, WV, Inc.'s Vermont contacts are completely

irrelevant. <u>Id.</u> And although he does not mention it,

Viko must believe that this consent is imputable to WV

Int'l, since WV Int'l does not have a registered agent

of its own in Vermont.[4]

Second, Viko contends that World Vision maintains

the necessary Vermont contacts to permit jurisdiction.

His argument proceeds as follows: (1) WV, Inc.

maintains continuous and systematic contacts with

Vermont, (2) WV, Inc. is a dependent affiliate of WV

Int'l and, (3) therefore, due process permits its

contacts with Vermont to be imputed to WV Int'l to

establish personal jurisdiction. In other words, Viko

does not dispute that WV Int'l, at least to the extent

that it is separate from WV, Inc., lacks "continuous"

and "systematic" business contacts of its own, but

instead argues that WV, Inc.'s relationship with WV

---

[4]     In reality, World Vision International-not "Inc."-is likely to be
the only defendant of any importance. Although Viko maintains that WV,
Inc. may ultimately bear some or all of the liability in this case,
World Vision has averred that only WV Int'l was responsible for the
hiring, training, and employment of Mr. Impada. (Christine Naylor Aff.
¶ 20); (Doc. 9 at 22).

Int'l is such that its contacts also establish personal jurisdiction over WV Int'l. (Doc. 9 at 9).

In response, World Vision attacks both premises of Viko's "minimum contacts" argument.[5]  It argues that WV, Inc. does not have substantial contacts with Vermont and, in any case, WV, Inc.'s Vermont contacts are irrelevant because WV, Inc. "is a separate legal entity from, and independent of, World Vision International," (Naylor Aff. ¶ 15) and therefore cannot serve as the basis for establishing personal jurisdiction over WV Int'l.[6]  World Vision also denies that WV, Inc. has consented to personal jurisdiction in Vermont.  (Doc.

---

[5]    It is worth noting that World Vision's presentation of its position on this motion has been less than transparent.  In its initial motion to dismiss World Vision argued *only* that WV, Inc.'s Vermont contacts could not be imputed to WV Int'l, since WV Int'l is a separate legal entity with no Vermont contacts of its own.  It provided no argument for the proposition that WV, Inc. itself was not subject to personal jurisdiction in Vermont.  In fact, World Vision appeared to explicitly exclude WV, Inc. from both its 12(b)(2) and 12(b)(3) motions, while including it only in its motions for transfer.  (Doc. 5 at 1).  Only in its Reply to Plaintiff's Opposition did World Vision finally argue that *neither* WV, Inc. nor WV Int'l is subject to this Court's jurisdiction.  Thus, World Vision created the bizarre possibility that WV Int'l could be dismissed for lack of personal jurisdiction because WV, Inc.'s Vermont contacts are insufficient, while WV, Inc. remains in Vermont court, at least in theory, because it never moved to dismiss in the first place.  Importantly, any prejudice caused to Viko by this approach is minimized because the Court permitted supplemental filings and, in any case, Viko bore the burden of demonstrating jurisdiction from the outset.  (Docs. 22 & 24).

[6]    That is not to say that the two companies are entirely unrelated, for the Defendants also state–with some ambiguity–that WV, Inc.'s "coordination" with WV Int'l is "subject to a mutual consent to operate according to a common set of principles and a statement of faith." (Naylor Aff. ¶ 18).

24 at 2-5).

### i. Personal Jurisdiction Over World Vision, Inc.

Since personal jurisdiction over WV Int'l is entirely dependent on whether this Court has general jurisdiction over WV, Inc., the Court begins with an analysis of (1) whether WV, Inc. has consented to jurisdiction, and (2) whether WV, Inc. has sufficient Vermont contacts to satisfy due process.

#### a. Did World Vision, Inc. Consent to General Jurisdiction in Vermont?

Viko argues that WV, Inc. consented to in personam jurisdiction in Vermont's courts for all causes of action, including those completely unrelated to Vermont, by registering to do business and appointing a registered agent in Vermont. (Doc. 22). Viko contends further that since individual defendants are free to waive objection or consent to personal jurisdiction, the Court need not determine whether World Vision maintains the necessary "minimum contacts" with Vermont to satisfy due process. Id.

The first step in evaluating Viko's claim must be to state the issue before the Court precisely. The

question is not whether, as some general matter, registering to do business in a forum by a foreign corporation amounts to jurisdictional consent.  Rather, the initial inquiry is whether, *as a matter of Vermont law*, WV, Inc.'s compliance with Vermont's foreign corporation registration statute means that it has expressly consented to personal jurisdiction in Vermont, even when an assertion of jurisdiction would be otherwise impermissible.

After all, the extent of Vermont's reach over non-resident defendants is controlled by its legislature, with only constitutional ceilings, and not floors, by which to abide.  See, e.g., Avery v. Bender, 204 A.2d 314, 316-317 (Vt. 1964); Pulson v. American Rolling Mill Co.,170 F.2d 193, 194 (1st Cir.1948) ("There is nothing to compel a state to exercise jurisdiction over a foreign corporation unless it chooses to do so, and the extent to which it so chooses is a matter for the law of the state as made by its legislature.").  This approach is also consistent with the rule that the "amenability of a foreign corporation to suit in a federal court in a diversity action is determined in

accordance with the law of the state where the court
sits, with federal law entering the picture only for
the purpose of deciding whether a state's assertion of
jurisdiction contravenes a constitutional guarantee."
Metropolitan Life, 84 F.3d at 567 (internal quotation
marks omitted); see also Ins. Corp. of Ireland, Ltd. v.
Compagnie des Bauxites de Guinee, 456 U.S. 694, 711-712
(1982) (Brennan, J., concurring).

Thus, decisions by courts faced with this issue in
other jurisdictions-including the Supreme Court-are not
binding, though they may be persuasive to the extent
they interpret and apply relevantly similar statutes.

Finally, understanding the initial state law
inquiry makes clear that only after a finding that WV,
Inc. has in fact provided its express consent to be
sued in Vermont must the Court consider whether
asserting jurisdiction on that basis alone would be
constitutionally permissible.  Metropolitan Life, 84
F.3d at 567.

Given the nature of the question, then, it is
puzzling that Viko fails to put forth a statutory
construction argument, or, for that matter, even

mention the Vermont registration statute at all.  (Doc.
22).  Instead, he discusses a completely inapposite
Vermont Supreme Court decision,[7] and urges the Court to
follow the precedent of the Second Circuit and New
York, though he cites not a single Second Circuit case
in his favor.  (Doc. 22 at 4).

Vermont, like every other state and the District
of Columbia, requires corporations organized and
incorporated elsewhere to register to do business.  <u>See</u>
11B V.S.A. § 15.01.  These laws are generally referred
to as "qualification" or "registration" statutes.  In
order to register in Vermont, a foreign corporation
must submit an application which indicates, among other
things, "the address of its registered office in this
state and the name of its registered agent at that
office."  11B V.S.A. § 15.03(a)(5).  The corporation
must also "continuously maintain...a registered agent"
to remain registered.  11B V.S.A. § 15.07(2).[8]

---

[7]     See the Court's discussion of <u>Burrington v. Ashland Oil Co., Inc.</u>,
356 A.2d 506 (Vt. 1976), <u>infra</u>.

[8]     World Vision cites 11 V.S.A. § 1630 as the relevant appointment
statute, and urges the Court to reject the notion of consent via
registration because § 1630 limits service upon the registered agent to
"action[s] founded upon liability incurred in this state."  (Doc. 24 at
4).  However, § 1630 applies only to nonresidents doing business in
Vermont in their "individual capacity" or under an assumed name.  <u>See</u> 16
V.S.A. § 1630.  Such is not the case here, and the applicable statutory

These provisions say nothing at all about
jurisdiction, let alone that by complying one expressly
consents to personal jurisdiction for all matters, even
those wholly unrelated to Vermont.  In fact, 11B V.S.A.
§ 15.10(a) restricts service upon a foreign
corporation's registered agent to service of process
that is "required or permitted by law to be served on
the foreign corporation."  Far from supporting the
proposition that appointing an agent effectually waives
all other legal protections from amenability to
judgment, this qualification suggests that the due
process minimum contacts requirement is essentially
built into the statute, at least when the assertion of
general jurisdiction is at stake.[9]  See, e.g., In re
Mid-Atlantic Toyota Antitrust Litig., 525 F. Supp.
1265, 1278 (D.C. Md. 1981).

Even without this restriction, though, and

_____

provisions are those requiring non-profit foreign corporations to
register in Vermont.  See 11B V.S.A. § 15.01-15.10.

[9]     The language of 11B V.S.A. § 15.10 is more restrictive than that
of some other statutes pursuant to which consent to general jurisdiction
was found.  See, e.g., Knowlton v. Allied Van Lines, Inc., 900 F.2d
1196, 1199 -1200 (8th Cir. 1990) (applying a Minnesota state statute
that said only that, "[a] foreign corporation shall be subject to
service of process . . . [b]y service on its registered agent[.]"); New
York Business Corporation Law § 304: "The secretary of state shall be
the agent of . . . every authorized foreign corporation upon whom
process against the corporation may be served."

assuming that service upon a foreign corporation's registered agent is effective for all causes of action, there remains an important distinction between mere service of process on the one hand, and actual amenability to judgment-that is, personal jurisdiction-on the other. While effective service demonstrates constitutionally sufficient notice, it does not, by itself, establish jurisdiction over the defendant's person. See, e.g., World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980) ("Due process requires that the defendant be given adequate notice of the suit...and be subject to the personal jurisdiction of the court.") (internal citations omitted); Omni Capital Intern., Ltd. v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 104 (1987); Fed. R. Civ. P. 4(d)(5) ("Waiving service of a summons does not waive any objection to personal jurisdiction or to venue.").[10]

---

[10]    The Court of Chancery of New Jersey explained this distinction well in 1905, saying that the effect of its registration statute "was not to enlarge the jurisdiction of the court, but to provide a method for enforcing its jurisdiction. When the artificial being came within the state and transacted business, it brought itself within the jurisdiction of the courts of the state; but, until a method was provided for bringing the foreign corporation before the court, the jurisdiction of the court could not be enforced. When such method was provided, it did not serve to give the court any jurisdiction that it did not have before, but merely enabled it to enforce that which it had." Groel v. United Electric Co., 60 A. 822, 828 (N.J. Ch. 1905).

It is informative, then, that while § 15.03 requires
the appointment of an agent, and § 15.10 permits
service of process upon that agent, none of the
relevant provisions explicitly require consent to
jurisdiction.

Additionally, there are no prior decisions
applying Vermont law to support Viko's argument. Viko
relies primarily on <u>Burrington v. Ashland Oil Co.,
Inc.</u>, 356 A.2d 506 (Vt. 1976), a Vermont Supreme Court
decision in which the court found jurisdiction to
adjudicate a case in which the defendant was a foreign
corporation and the alleged tort occurred outside of
Vermont. Viko believes this case to be persuasive
because the defendant was registered to do business in
Vermont, and the court established jurisdiction without
entering into any further due process analysis. (Doc.
22 at 1-2). In <u>Burrington</u>, however, the only
jurisdictional question was whether a Vermont state
court possessed jurisdiction over the *subject matter*,
not the defendant. The court described the defendant's
objection "that the accrual of the cause of action in
Maine and the non-residency of the parties deprive the

Vermont courts of jurisdiction over the *subject matter*," Burrington, 356 A.2d at 509 (emphasis added), and then framed the issue presented as whether "the lower court [has] jurisdiction over a *cause of action* arising outside of Vermont, where both the plaintiff-administrator and defendant corporation are non-residents of Vermont and the defendant is registered to do business in Vermont[.]" Id. (emphasis added).[11] Beyond the issue of jurisdiction, the court only considered whether Vermont was a sufficiently convenient forum under the doctrine of *forum non conveniens*. Id. at 509-510. Thus, Burrington is not relevant to the present inquiry.

Further, in Metropolitan Life, 84 F.3d 560 (2d Cir. 1996) the Second Circuit found personal jurisdiction lacking when a defendant registered to do business in Vermont was sued in Vermont.[12] The court

_____

[11]    Burrington is also distinguishable because "a most compelling factor" in its holding was the fact that a state court without jurisdiction must dismiss the matter outright, while a federal court, such as this one, is statutorily authorized to transfer the case within the federal system.  Burrington, 356 A.2d at 509; see also 28 U.S.C. § 1406(a).

[12]    Viko characterizes Metropolitan Life as upholding general jurisdiction, but that is a misreading of the case.  (Doc. 22 at 3, n.1).  In fact, the Circuit found that "the exercise of jurisdiction...would violate traditional notions of fair play and substantial justice," and affirmed the District Court's order dismissing the case for lack of personal jurisdiction.  Metropolitan Life, 84 F.3d

18

proceeded directly to a minimum contacts analysis, and
ultimately found that Vermont's exercise of in personam
jurisdiction over the defendant would have been
"unreasonable." Id. at 576. Viko argues that this case
is insignificant because "[w]hile the defendant . . .
had registered to do business in Vermont, it apparently
had not appointed a service agent[.]" (Doc. 22 at 3,
n.1).  But Viko fails to deduce that, just as it is
under current Vermont law, the defendant in
Metropolitan Life could not have registered to do
business if it had not also appointed an agent to
receive process.  See 11 V.S.A. § 2105 (1990).[13]

To be sure, Metropolitan Life does not
specifically address the issue of whether registering
to do business in Vermont is the equivalent of
consenting to general jurisdiction in Vermont's courts.
But its example as a case denying Vermont personal
jurisdiction over a foreign corporation registered to
do business is further evidence that Vermont law

---

at 576.

[13]   Viko's attempt to distinguish Metropolitan Life on this basis is
also surprising because the Burrington Court–upon which Viko principally
relies–likewise makes no specific mention of the defendant's registered
agent, noting only that it was registered to do business in Vermont.
Burrington, 356 A.2d 506 (Vt. 1976).

requires more than mere compliance with its
registration statute before a defendant may be haled
into court.

Finally, a finding of general jurisdiction on a
consent-based theory in this case would require the
Court to adopt a unique conception of consent relative
to all other legal contexts.  In this case, there is no
contract between Viko and World Vision to litigate in
Vermont, no agreement to arbitrate, and no stipulation
to jurisdiction by the Defendants.  <u>See</u>, <u>e.g.</u>, <u>Ins.
Corp. of Ireland, Ltd.</u>, 456 U.S. at 703-704 (providing
a list of ways in which defendants may consent to
jurisdiction which does not include registering to do
business).[14]  Instead, Viko claims consent based on
compliance with a statute that says nothing on its face
about either jurisdiction or consent, and in a state in
which the limited case law on the issue, if anything,
points in the opposite direction.  Under these
conditions it is impossible to see how World Vision

_____

[14]     The Eighth Circuit reasoned, without citation to authority, that
consent via registration was "possibly omitted from the Supreme Court's
list because it is of such long standing as to be taken for granted."
<u>Knowlton v. Allied Van Lines, Inc.</u>, 900 F.2d 1196, 1200 (8th Cir.1990).
This seems improbable, however, unless one also assumes that providing
consent via a contractual arrangement-which <i>is</i> listed-is somehow
unobvious.

gave its express and considered "consent to be hauled
into [Vermont] courts on any dispute with any party
anywhere concerning any matter" when it submitted an
application to transact business within Vermont.
Wenche Siemer v. Learjet Acquisition Corp., 966 F.2d
179, 183 (5th Cir. 1992); see generally Lee Scott
Taylor, *Registration Statutes, Personal Jurisdiction,
and the Problem of Predictability*, 103 COLUM. L. REV.
1163 (2003) (arguing that consent is an inadequate
theory upon which to find general jurisdiction from
compliance with registration statutes because the
consequences of such compliance are unpredictable);
Matthew Kipp, *Inferring Express Consent: The Paradox of
Permitting Registration Statutes to Confer General
Jurisdiction*, 9 REV. LITIG. 1, 42-43 (1990) (arguing that
"it is contradictory to infer from a statute an express
consent to general jurisdiction when that statute does
not explicitly mention the consequences that compliance
will have on jurisdiction."). Even if the Court were
so inclined, Vermont law does not permit such a
tortured conception of consent to be applied in the
context of personal jurisdiction. See First Nat'l Bank

of Boston v. Avtek, Inc., 360 A.2d 80, 85 (Vt. 1976) ("Consents to jurisdiction are narrowly construed, and will not be extended beyond their plain meaning and scope.").

For all of the foregoing reasons, I find that compliance with Vermont's foreign corporation registration statute does not entail consent to general personal jurisdiction, at least independently of the minimum contacts required by due process. However, since courts have considered this issue pursuant to similar statutes in a variety of jurisdictions, a few words are necessary to explain that such decisions do not compel a finding of consent in this case.

Rightly or wrongly, the continued notion that appointing a local agent to accept service amounts to jurisdictional consent is derived largely from the 1917 Supreme Court decision of Pennsylvania Fire Ins. Co. v. Gold Issue Mining & Milling Co., 243 U.S. 93 (1917); see also Pierre Riou, General Jurisdiction Over Foreign Corporations: All That Glitters Is Not Gold Issue Mining, 14 REV. LITIG. 741, 748-752 (1995); Lea Brilmayer, et al., A General Look At General

*Jurisdiction*, 66 TEX. L. REV. 721, 755-760 (1988). In
Gold Issue, the defendant Pennsylvania insurance
company obtained a license to do business in Missouri
and, as required, "filed with the superintendent of the
insurance department a power of attorney consenting to
that service of process upon the superintendent should
be deemed personal service upon the company[.]" Id. at
94. After being sued in Missouri on a cause of action
unrelated to its Missouri contacts, the defendant
argued that service upon its agent was "insufficient
except in suits upon Missouri contracts[.]" Id. The
Missouri Supreme Court rejected this view, construing
the relevant appointment statute to entail consent to
accept service for all lawsuits. Id. at 95.

The Supreme Court subsequently affirmed and found
no constitutional infirmities. Id. In a brief and
rather cryptic opinion by Justice Holmes, the Court
explained that the Missouri Supreme Court's statutory
construction "did not deprive the defendant of due
process of law even if it took the defendant by
surprise, which we have no warrant to assert." Id.
Holmes later distinguished between implied consent

inferred from the doing of business within a state, and
actual consent provided by compliance with the state's
appointment statute: "But when a power actually is
conferred by a document, the party executing it takes
the risk of the interpretation that may be put upon it
by the courts.  The execution was the defendant's
voluntary act."[15]  <u>Id.</u> at 96.

Obviously, <u>Gold Issue</u> was decided prior to the
landmark Supreme Court decision of <u>International Shoe</u>,
which shifted the paradigm of personal jurisdiction
away from a state's de facto "physical power" over a
defendant, <u>see</u> <u>McDonald v. Mabee</u>, 243 U.S. 90, 91
(1917); <u>Pennoyer v. Neff</u>, 95 U.S. 714 (1877), towards
compliance with "fair play and substantial justice,"
and the qualitative relationship between the defendant,
the forum, and the litigation.  <u>International Shoe</u>, 326
U.S. at 316-319; <u>Shaffer v. Heitner</u>, 433 U.S. 186, 204
(1977).  As explained above, personal jurisdiction over
a foreign defendant is now generally established by an
assessment of the defendant's contacts with the forum

---

[15]    Of course, the "interpretation" was that of the Missouri Supreme
Court—the only question for Justice Holmes and the U.S. Supreme Court
was whether that interpretation violated the Due Process Clause.

state, rather than whether the defendant is "present" within the state. <u>See</u> <u>Shaffer</u>, 433 U.S. at 212 ("all assertions of state-court jurisdiction must be evaluated according to the standards set forth in <u>International Shoe</u> and its progeny.").

Nonetheless, some courts persist in following <u>Gold Issue</u> to find consent to general personal jurisdiction when a foreign corporation registers to do business. For example, the Delaware Supreme Court conducted a thorough examination of <u>Gold Issue</u> and the transition to <u>International Shoe</u> in <u>Sternberg v. O'Neil</u>, 550 A.2d 1105 (Del. 1988). In <u>Sternberg</u>, the court explained that "the holdings of the United States Supreme Court which involved foreign corporations, following <u>International Shoe</u>, are entirely consistent with the continued viability of its earlier holding in <u>Pennsylvania Fire Ins. Co. [v. Gold Issue</u>]." <u>Id.</u> at 1113. The court concluded that if "a foreign corporation has expressly consented to the jurisdiction of a state by registration, due process is satisfied and an examination of 'minimum contacts' to find implied consent is unnecessary." <u>Id.</u>; <u>see</u> <u>also</u> <u>The</u>

<u>Rockefeller Univ. v. Ligand Pharm.</u>, 581 F. Supp. 2d
461, 467 (S.D.N.Y. 2008) (finding that the defendant's
"unrevoked authorization to do business and its
designation of a registered agent for service of
process amount to consent to personal jurisdiction in
New York."); <u>Knowlton v. Allied Van Lines, Inc.</u>, 900
F.2d 1196, 1200 (8th Cir. 1990) ("We conclude that
appointment of an agent for service of process . . .
gives consent to the jurisdiction of Minnesota courts
for any cause of action, whether or not arising out of
activities within the state.  Such consent is a valid
basis of personal jurisdiction, and resort to minimum-
contacts or due-process analysis . . . is
unnecessary."); <u>Sondergard v. Miles, Inc.</u>, 985 F.2d
1389, 1397 (8th Cir. 1993) (citing <u>Gold Issue</u>, 243 U.S.
at 96).

But other courts have refused to infer
jurisdictional consent from compliance with
registration statutes, arguing, inter alia, that it is
inconsistent with the current "fundamental fairness"
model of personal jurisdiction under <u>International Shoe</u>
and its progeny.  <u>See</u>, <u>e.g.</u>, <u>Freeman v. The Second</u>

26

<u>Judicial District Court</u>, 1 P.3d 963 (Nev. 2000);
<u>Ratliff v. Cooper Labs., Inc.</u>, 444 F.2d 745, 748 (4th
Cir. 1971) ("Applying for the privilege of doing
business is one thing, but the actual exercise of that
privilege is quite another . . . The principles of due
process require a firmer foundation than mere
compliance with state domestication statutes.");
<u>Consol. Dev. Co. v. Sherritt, Inc.</u>, 216 F.3d 1286, 1293
(11th Cir. 2000) ("Courts of appeals that have
addressed this issue have rejected the argument that
appointing a registered agent is sufficient to
establish general personal jurisdiction over a
corporation."); <u>Sandstrom v. ChemLawn Corp.</u>, 904 F.2d
83, 89 (1st Cir. 1990) (mere license to do business and
designation of agent for service of process within the
forum state insufficient to confer general
jurisdiction); <u>Learjet Acquisition Corp.</u>, 966 F.2d at
183 ("In short, a foreign corporation that properly
complies with the Texas registration statute only
consents to personal jurisdiction where such
jurisdiction is constitutionally permissible.").

   In particular, reliance on <u>Gold Issue</u> and other

pre-International Shoe case law has come under scrutiny
by courts and contemporary legal scholars.  Some have
contended that the "consent" found by Justice Holmes in
Gold Issue was not really consent at all, but rather a
functional proxy for the physical presence generally
required to assert jurisdiction under the framework of
Pennoyer v. Neff.  See Kipp, *Inferring Express Consent*,
9 REV. LITIG. at 9; Freeman, 1 P.3d at 968.  Under this
view, the reasoning of Gold Issue was necessary to
ensure that state residents had a means to pursue legal
claims against the foreign corporations doing business
in their state.  Under the traditional rule that
corporations legally existed only in the state of their
incorporation, Bank of Augusta v. Earle, 38 U.S. 519,
588 (1839), state registration statutes created the
legal fiction of "presence" within the forum that
allowed foreign corporations to be served and brought
to appear before local courts.[16]  See In re DES Cases,
789 F. Supp. 552, 580 (E.D.N.Y. 1992).  Since this

---

[16]    The International Shoe Court itself gave credence to this view,
observing that "some of the decisions holding the corporation amenable
to suit have been supported by resort to the legal fiction that it has
given its consent to service and suit, consent being implied from its
presence in the state through the acts of its authorized agents. .
.[b]ut more realistically it may be said that those authorized acts were
of such a nature as to justify the fiction."  International Shoe, 326 at
318-319 (internal citations omitted).

rationale no longer holds true under the current
doctrine of minimum contacts and out-of-state service,
some have argued that <u>International Shoe</u> was as deadly
to <u>Gold Issue</u> as it was to <u>Pennoyer</u>, and that service
upon a registered agent does not confer jurisdiction
absent sufficient forum contacts. <u>See</u>, <u>e.g.</u>, <u>Freeman</u>,
1 P.3d at 968; <u>Shaffer</u>, 433 U.S. at 227 (Brennan, J.,
dissenting) ("Once we have rejected the jurisdictional
framework created in <u>Pennoyer v. Neff</u>, I see no reason
to rest jurisdiction on a fictional outgrowth of that
system such as the existence of a consent statute.");
<u>In re Mid-Atlantic Toyota Antitrust Litig.</u>, 525 F.
Supp. 1265, 1278 n.10 (D.C. Md. 1981) ("consent
statutes are largely obsolete and serve only to confuse
matters in unusual cases. . .where a corporation's only
contact with a state is its act of registering to do
business there.").

Others have argued persuasively that the issue in
<u>Gold Issue</u> was limited to consent to *service* only, and
not to personal jurisdiction. <u>See</u> Pierre Riou, *General
Jurisdiction Over Foreign Corporations: All That
Glitters Is Not Gold Issue Mining*, 14 REV. LITIG. 741

(1995); see also Cognitronics Imaging Sys., Inc. v.
Recognition Research Inc., 83 F. Supp. 2d 689, 692 n.1
(E.D. Va. 2000).  This view is supported on numerous
grounds.  First, while Justice Holmes made no mention
of the defendant's state contacts aside from its
appointed agent, the lower court's finding of
jurisdiction was based, in part, upon the premise that
companies subject to suit on the basis of registration
were also conducting business in the forum.  Gold Issue
Min. & Mill. Co. v. Pennsylvania Fire Ins. Co., 267 Mo.
524 (1916), aff'd 243 U.S. 93 (1917).  Second, the Gold
Issue opinion itself speaks only of effective service,
saying, for example, "[t]he defendant had executed a
power of attorney that made service upon the
superintendent [of insurance] the equivalent of
personal service."  Gold Issue, 243 U.S. at 95.  In
contrast, there is no indication by Justice Holmes that
the Missouri statute was jurisdictional, at least not
beyond conferring jurisdiction that was already
established by the defendant's business activities.
Third, there is evidence that the prevailing practice
during this era required a showing that a corporation

was actually doing business in the forum state, along
with adequate service, to establish personal
jurisdiction.  <u>United States v. American Bell Tele.
Co.</u>, 29 F. 17, 34-35 (Circuit Court, S.D. Ohio 1886);
<u>Connecticut Mut. Life Ins. Co. v. Spratley</u>, 172 U.S.
602, 618 (1899).  Accordingly, under this
interpretation, <u>Gold Issue</u> allowed states to use
registration statutes as a means to reach foreign
corporations and enforce their jurisdiction, but it did
not increase their jurisdiction to include registered
foreign corporations that maintained no other business
contacts in the forum.

This same interpretation can be given to Judge
Cardozo's opinion in <u>Bagdon v. Philadelphia & Reading
Coal & Iron Co.</u>, 111 N.E. 1075 (N.Y. 1916), upon which
<u>Gold Issue</u> heavily relies, and which is the
foundational case for the general New York rule that
Viko urges the Court to follow.  <u>Gold Issue</u>, 243 U.S.
at 95; <u>The Rockefeller Univ.</u>, 581 F. Supp. at 466-467;
(Doc. 22 at 3-4).  Later courts finding consent via
registration have pounced on Justice Cardozo's
promulgation that "[t]he meaning must therefore be that

the appointment [of a registered agent] is for any
action which under the laws of this state may be
brought against a foreign corporation. . .[i]t means
that, whenever jurisdiction of the subject-matter is
present, service on the agent shall give jurisdiction
of the person." <u>Bagdon</u>, 111 N.E. at 1076.  But they
ignore the full context of this statement and Judge
Cardozo's later qualification that "[i]t is true that
even the president of a foreign corporation may be here
without bringing the corporation itself within this
jurisdiction . . . [b]ut when a corporation *is* engaged
in business in New York, and is here represented by an
officer, he is its agent to accept service, though the
cause of action has no relation to the business here
transacted." <u>Id.</u> at 1077.  Thus Judge Cardozo
apparently endorsed the rule that effective service is
a necessary but not sufficient element of the
jurisdictional equation, and must be combined with a
showing that the defendant actually conducts business
in the forum state.  <u>See</u> <u>Enger v. Midland Nat. Life
Ins. Co.</u>, 222 N.W. 901, 903 (Minn. 1929) ("*So long as
defendant is here doing business*, having appointed the

32

insurance commissioner . . . its lawful attorney in
fact . . . we deem the service of this summons
accordingly as effective to give jurisdiction over
defendant as if served upon its principal agent[.]")
(emphasis added) (citing Bagdon, 111 N.E. 1075); Tauza
v. Susquehanna Coal Co., 115 N.E. 915, 917-918 (N.Y.
1917) ("Unless a foreign corporation is engaged in
business within the state, it is not brought within the
state by the presence of its agents.").

Thus, there is substantial evidence to suggest
that those jurisdictions holding onto the notion of
registration as consent to general jurisdiction do so
based on a complete misinterpretation of prior law.
Further, to the extent that early cases such as Bagdon
and Gold Issue hold that compliance with a registration
requirement alone establishes personal jurisdiction
-whether based on "consent," "presence," or some other
theory-the viability of such holdings is cast in doubt
by the Supreme Court's adoption of the "minimum
contacts" approach to jurisdiction and due process in

<u>International Shoe</u>.[17]  <u>See</u> <u>also</u> <u>Perkins</u>, 342 U.S. at

446.

    To be sure, there exists a body of case law

supporting Viko's argument that World Vision, Inc. has

consented to be sued on all matters in Vermont.  But

the foundation supporting that law is too brittle and

unsettled to compel the Court to follow it here,

especially when so many jurisdictions disagree, and a

plain reading of Vermont's registration statute, along

with other relevant Vermont law and modern Supreme

Court cases, point with relative clarity in the

opposite direction.[18]  Accordingly, I find that absent

---

[17]    Since <u>Insurance Corp. of Ireland</u>, 456 U.S. 694 (1982), there is
little doubt that due process permits defendants to consent to
jurisdiction.  But it is a separate question whether due process will
allow the inference of jurisdictional consent from compliance with a
state registration statute, especially one, like Vermont's, from which
the inference is less than obvious.  On this precise point courts appear
to be divided.  <u>See</u>, <u>e.g.</u>, <u>In re DES Cases</u>, 789 F. Supp. at 591-592
("Although the Supreme Court has not directly pronounced on the subject
. . . the constitutionality of the traditional practice of asserting
general jurisdiction solely on the basis of a corporation's being
licensed to do business in the forum seems to have survived
<u>International Shoe</u>.");  <u>Learjet Acquisition Corp.</u>, 966 F.2d at 184
(commenting that it would violate due process to find jurisdiction over
a defendant based solely on its registration to do business).  Even if
due process is satisfied with such jurisdiction, though, placing this
condition on foreign corporations engaged in interstate commerce may
exceed states' authority under the Dormant Commerce Clause.  <u>See</u>, <u>e.g.</u>,
<u>Davis v. Farmers' Co-op. Equity Co.</u>, 262 U.S. 312 (1923); <u>Pensacola Tel.
Co. v. Eastern Union Tel. Co.</u>, 96 U.S. 1 (1877).

[18]    Notably, not even the law of New York is universally in Viko's
favor.  <u>See</u>, <u>e.g.</u>, <u>Bellepointe, Inc. v. Kohl's Dept. Stores, Inc.</u>, 975
F. Supp. 562, 564 (S.D.N.Y. 1997) (declining to follow the proposition
that possession of a license to do business is sufficient to assert
jurisdiction to "adhere instead to the rule . . . that a license to do
business is not dispositive on the issue of personal jurisdiction.")

the requisite "minimum contacts" with the state of
Vermont, service upon a defendant foreign corporation's
registered agent does not, by itself, confer general
personal jurisdiction over the defendant.  Whether such
contacts exist in this case is the matter to which I
now turn.

### b. Are World Vision, Inc.'s Vermont Contacts Sufficient to Satisfy Due Process?

Viko alleges that WV, Inc. maintains contacts with
Vermont that are continuous and "so substantial and of
such nature as to justify suit against it on causes of
action arising from dealings entirely distinct from
those activities."  These contacts include (1) WV,
Inc.'s registration to do business in Vermont and the
appointment of an agent to receive service of process,
(2) a World Vision radio program, "World Vision
Report," that is regularly broadcast via local radio
stations in seven Vermont localities, and (3) WV,
Inc.'s website, which allows users, including
Vermonters, to make online donations.  (Doc. 9 at 7-8;
Doc. 9-3 at 28.)  Viko also contends, though without

--------

(internal citation omitted).

any discernable bases, that World Vision "receives substantial benefits from marketing and fundraising conducted in Vermont[.]" (Doc. 9 at 8).

Though the relevance of each of these contacts may be analyzed individually, they ultimately must be considered together, in sum, to evaluate the extent of WV, Inc.'s Vermont contacts. <u>Metropolitan Life</u>, 84 F.3d at 571.

The most complex issue presented is the degree, if any, to which WV, Inc.'s website should be considered a continuous and substantial contact with the state of Vermont. As many courts have already recognized, the internet presents a new test for the traditional minimum contacts standards promulgated by the Supreme Court in <u>International Shoe</u> and its progeny. A website hosted at one location can be accessed not only in every state of the U.S., but all over the world. And perhaps most importantly in the context of personal jurisdiction, "[u]nlike newspaper, mailing, radio, television, and other media containing advertisements and solicitations, most Internet advertisements and solicitations are not directed at . . . specific

geographic areas or markets; to the contrary, advertising on the Internet targets no one in particular and everyone in particular in any given geographic location." <u>Millennium Enter., Inc. v. Millennium Music LP</u>, 33 F. Supp. 2d 907, 914 (D. Or. 1999).

The seminal case on the internet and jurisdiction is likely <u>Zippo Mfg. Co. v. Zippo Dot Com, Inc.</u>, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997), in which the court described its "sliding scale" test for individual websites. In designing its "sliding scale" the court tried to balance the reality that the Internet allows companies to maintain substantial commercial contacts in many fora without any actual physical presence, with the concern that jurisdiction predicated on websites could "turn the notion of federal personal jurisdiction on its head, eliminating the protections that jurisdictional requirements were designed to safeguard." <u>Bell v. Imperial Palace Hotel/Casino</u>, 200 F. Supp. 2d 1082, 1091 (E.D. Mo. 2001); <u>Cf.</u> <u>Hanson v. Denckla</u>, 357 U.S. 235, 251 (1958).

The <u>Zippo</u> court found that, "the likelihood that

personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet."  Id. at 1124.  The court then described its scale, on one end of which are "passive" websites which merely post information that can be accessed by users in a foreign jurisdiction.  On the other end are "active" sites through which "a defendant clearly does business over the Internet," such as by entering "contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet."  Id.  In the former instance personal jurisdiction will not lie, but in the latter a defendant's business contacts via online interactions may bring its person within the jurisdiction of a foreign forum.  The court also described an intermediate area on the scale for websites that are "interactive," meaning a user can exchange information with the host computer, but is not able to enter contracts or engage in other commercial activity online.  In these cases, "the exercise of jurisdiction is determined by examining the level of

interactivity and commercial nature of the exchange of information that occurs on the Website."  Id.; see also On-Line Tech. v. Perkin Elmer Corp., 141 F. Supp. 2d 246, 265 (D. Conn. 2001).

While the Zippo test has been used repeatedly in many jurisdictions, and both parties urge it upon the Court, there are two impediments to its application here.[19]  First, Zippo concerned only *specific* personal jurisdiction, not general, so its reasoning is not perfectly analogous to the present case.[20]  Second, many courts have recognized that the "test" is not really a test at all, at least not in the sense that it represents a formal legal standard.  Instead, the sliding scale is merely an analytical framework through which judicial evaluations about online activity can be

---

[19]    Viko's assertion that "[t]his Court has adopted the factors set out in Zippo . . . in order to determine whether maintenance of an interactive website supports a finding of general jurisdiction in this district" is not accurate.  First, the case cited by Viko, Hyperkinetics Corp. v. Flotec, Inc., 2003 WL 25278086 (D. Vt. September 25, 2003) concerned a claim that the defendant's website gave rise to specific jurisdiction.  Id. at *5.  Second, while the Court discussed Zippo, it did not formally adopt it.  Id.  World Vision also claims Zippo applies to this case.  (Paper 16 at 4).

[20]    A number of courts faced with a general jurisdiction inquiry have relied on Zippo, though the analysis is generally modified to ensure that sufficient forum contacts are present.  See, e.g., Mink v. AAAA Development, LLC, 190 F.3d 333, 335-336 (5th Cir. 1999); Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 513 (D.C. Cir. 2002); Soma Medical Int'l v. Standard Chartered Bank, 196 F.3d 1292 (10th Cir. 1999).

made.  See, e.g., Lakin v. Prudential Sec., Inc., 348
F.3d 704, 711 (8th Cir. 2003).

As the Zippo court itself noted, the sliding scale
only goes to the "likelihood," or *potential*, that a
particular website has for maintaining continuous and
substantial contacts in a foreign jurisdiction.  "The
analysis cannot begin and end with the 'active' and
'passive' labels . . . [t]he fact that a site is
classified as 'interactive' is irrelevant to the
analysis of general jurisdiction if no one from the
forum state has ever used the site."  Bell v. Imperial
Palace Hotel/Casino, 200 F. Supp. 2d at 1091-1092.
Accordingly, "While . . . the Zippo sliding scale of
interactivity may help frame the jurisdictional inquiry
in some cases . . . it does not amount to a separate
framework for analyzing internet-based jurisdiction,"
and the traditional notions of minimum contacts and due
process–that is, whether the defendant deliberately
maintains substantial and continuous contacts in a
particular forum–still govern the inquiry.  Best Van
Lines, Inc. v. Walker, 490 F.3d 239, 252 (2d Cir. 2007)
(internal quotation marks omitted); see also Hy Cite
Corp. v. Badbusinessbureau.com, LLC, 297 F. Supp. 2d

1154, 1160 (W.D. Wis. 2004) ("regardless of how interactive a website is, it cannot form the basis for personal jurisdiction unless . . . the contacts through the website are so substantial that they may be considered 'systematic and continuous'"); Coastal Video Communications Corp. v. Staywell Corp., 59 F. Supp. 2d 562 (E.D. Va. 1999).

This focus on the actual contacts made through a website, as opposed to the mere nature of the website itself, is particularly important in the context of *general* personal jurisdiction. Indeed, there is a "consensus among the courts . . . that general jurisdiction cannot be founded solely on the existence of a defendant's internet website." Degesse v. Plant Hotel N.V., 113 F. Supp. 2d 211, 221 (D. N.H. 2000); see also WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL: 3d § 1073.1 (2002) ("The mere maintenance of a website in one state, by itself, apparently will not be sufficient to subject a defendant to the general in personam jurisdiction of a federal court in another state.").

Accordingly, in order to demonstrate jurisdiction a plaintiff cannot merely show the existence of a

website–even one that is "active" or "interactive"–but must show actual substantial and continuous contact through the website with the forum state.  <u>ESAB Group, Inc. v. Centricut, LLC</u>, 34 F. Supp. 2d 323, 330-331 (D.S.C. 1999) ("the critical issue for the court to analyze is the nature and quality of commercial activity actually conducted by an entity over the Internet in the forum state.").  That a website creates the mere potential for forum contact, or renders contact foreseeable, will not be sufficient to establish a substantial presence within the forum.  <u>See Bensusan Rest. Corp. v. King</u>, 937 F. Supp. 295, 301 (S.D.N.Y. 1996) <u>aff'd</u> 126 F.3d 25 (2d Cir. 1997).

   In this case, WV, Inc.'s website promotes World Vision and permits internet users to make donations via online transactions and sign up for email updates from World Vision.  (Doc. 9 at 7-8; Doc. 9-3 at 28).  It also allows users to order, free of charge, World Vision display materials for individual use.  <u>Id.</u> Despite conceding that the site "provides a portal for making donations," World Vision makes the odd claim that it "is nothing more than a passive site that makes information available about the World Vision

partnership[.]" (Doc. 16 at 5).  That dog, quite
obviously, will not hunt.  But as discussed, the extent
to which WV, Inc.'s website has the functional capacity
for commercial interactivity is of little relevance
absent actual and continuous contacts with Vermont.

Consistent with this legal approach, other courts
have declined to assert personal jurisdiction when the
defendant's contacts consist of an interactive website
in addition to other minimal forum contacts.  For
example, in <u>Degesse v. Plant Hotel N.V.</u>, 113 F. Supp.
2d 211 (D. N.H. 2000), the district court found that it
did not have general personal jurisdiction over a
foreign hotel company, even though the defendant
broadcast television advertisements in the forum and
maintained a website through which forum residents
could make reservations.  The court said that, "[e]ven
assuming that the advertisements were aired on local
television, and even taken together with [the
defendant's website], such activities do not constitute
continuous and systematic contacts and therefore cannot
support an assertion of general jurisdiction."  <u>Id.</u> at
219.  Moreover, the court added that because the
plaintiffs offered no evidence that the defendant

"actually and deliberately used its website to conduct commercial transactions or other activities with residents of the forum . . . the website adds *no support* to their claim of general jurisdiction." Id. at 223-224 (emphasis added).

In Hy Cite Corporation, 297 F. Supp. 2d 1154 (W.D. Wis. 2004) a district court in Wisconsin considered personal jurisdiction based on a website similar to that of WV, Inc. In Hy Cite, the defendant, a company designed to aid disgruntled consumers, operated a website that solicited donations and allowed users to volunteer as "rip-off reporters." Id. at 1161. In addition to its website the defendant sold one book to, and had communications with, Wisconsin residents. Id. The court found that "plaintiff's argument that general jurisdiction exists in this case borders on the frivolous . . . With the exception of the book sale to one Wisconsin resident and the communication between the parties, all of the activities identified by the plaintiff consist of nothing more than *potential* contacts." Id.

Here, Viko has alleged nothing more than potential contacts with Vermont via WV, Inc.'s website. Despite

Viko's assertion that WV, Inc.'s website is "directed
to Vermont residents," and "although [he] characterizes
defendant's internet-based activities as 'soliciting'
[Vermont] business, [he] has not alleged that defendant
has done anything to target internet users in
[Vermont]."[21]  (Doc. 9 at 7; Doc. 22 at 8); <u>Hy Cite</u>, 297
F. Supp. 2d at 1161.  Accordingly, although WV, Inc.'s
website may be a "continuous" contact in the sense that
it is available to Vermonters 24 hours of every day, it
is not "substantial" and is therefore not a significant
contact for purposes of asserting general personal
jurisdiction.

"World Vision Report" is also broadcast regularly
throughout Vermont but, far from "peppering the
airwaves" as Viko describes, the broadcast occurs only
on weekends and generally in the early morning hours.
(Doc. 9 at 8, Doc. 16 at 3.)  This contact is
continuous in that it airs every week, but it is hardly
substantial.  Moreover, there are no allegations that
the broadcast is in any way commercial in nature, or

---

[21]   Viko initially argued that the "drop down" menus on WV, Inc.'s
website which allowed for the selection of "Vermont" (as well as every
other state) was evidence that the defendant targeted Vermonters.  (Doc.
9 at 7-8).  But he has since conceded that this fact would only be
relevant in a case of specific jurisdiction.  (Doc. 22 at 8 n.6).

even that it describes or discusses World Vision projects.  According to the evidence submitted by Viko, it is simply a news broadcast, designed to "capture[] the human drama behind global issues and events affecting the world's poorest children and families." (Doc. 9 at 8).  This evidence distinguishes this case from those cited by Viko in which sustained local advertising supported a finding of jurisdiction.  (Doc. 22 at 5).

And while the broadcast is apparently made via local affiliate stations, there is no evidence that the show specifically targets Vermonters.  To the contrary, counsel for World Vision represented that "the radio broadcasts at issue are nationwide in scope" (Doc. 24 at 7), an assertion uncontradicted by Viko.

Finally, we return to the issue of WV, Inc.'s registered agent, analyzing it not as consent, but as one WV, Inc.'s "contacts" with the state of Vermont. In this regard, and as recognized by this Circuit, I am persuaded that a registered agent and a concomitant authorization to do business are of minor significance. Much like the creation of a website, the mere authorization to do business is only a *potential*

contact, and is clearly distinct from actually engaging
in continuous and substantial commercial activity.  See
Metropolitan Life, 84 F.3d at 570 (citing Sandstrom v.
ChemLawn Corp., 904 F.2d 83, 89 (1st Cir 1990), for the
proposition that a "mere license to do
business...within [the] forum state [is] insufficient
to confer general jurisdiction"); Ratliff, 444 F.2d at
748 ("Applying for the privilege of doing business is
one thing, but the actual exercise of that privilege is
quite another . . . The principles of due process
require a firmer foundation than mere compliance with
state domestication statutes."); Contra Junction Bit &
Tool Co. v. Institutional Mortgage Co., 240 So.2d 879,
882 (Fla. App. 1970) (finding that minimum contacts are
"patently established" where a foreign corporation has
qualified to do business in the forum state).

     In sum, WV, Inc. has neither an office, a bank
account, nor employees in Vermont.  It is not organized
under Vermont's laws, its principal place of business
is elsewhere, and no supervisory decisions are made in
Vermont.  Even considering the contacts alleged by Viko
together, as the courts did in Hy Cite and Degesse,
there are really no deliberate and continuous contacts

with Vermont aside from a nationally syndicated radio program that airs on weekends, sometimes at four in the morning.  (Doc. 16 at 3).  WV, Inc. does maintain an interactive website, but since it does not in any way target Vermont residents specifically, it is no more present here than in any other forum.  Given the ever rising frequency with which even small businesses maintain interactive websites, giving significant weight to this contact would essentially eviscerate traditional principles of federalism and jurisdiction divided among the several states.

Drawing all inferences in favor of Viko, these contacts may rise above those rejected as insufficient by the Supreme Court in Helicopteros, since Helicopteros involved "mere purchases," and here there is some level of solicitation.  Helicopteros, 466 U.S. at 411.  But they are less significant than those present in other "close cases" from this district, including Sollinger v. Nasco, 655 F. Supp. at 1388-1389 (finding general jurisdiction over defendant who targeted individual Vermont residents with direct mailings), and Metropolitan Life, 84 F.3d at 572-573 (finding minimum contacts in a "close case" where the

defendant had $4 million in sales to Vermont, registered to do business in Vermont, maintained relationships with dealers and "authorized" builders in Vermont, provided advertising and support to Vermont residents, and deliberately targeted Vermont firms as sales prospects).

Accordingly, I find that WV, Inc. lacks the continuous and substantial contacts with the state of Vermont that would allow it to be sued here on a cause of action arising out of an automobile accident in Mozambique. It is true that at this early stage of the litigation Viko need only make out a prima facie case of jurisdiction, but that means he "must plead facts which, if true, are sufficient in themselves to establish jurisdiction." Bellepointe, Inc., 975 F. Supp. at 564 -565; Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 184 (2d Cir. 1998). This Viko has not done. While he has shown that WV, Inc. is not completely absent from Vermont, the "more stringent" assessment of state contacts required for general jurisdiction implies that one can have *some* contact with a forum—even more than negligible contact—before being subject to the forum's courts on any matter

arising any where.

Additionally, the Court finds it would likewise violate due process to assert personal jurisdiction over World Vision International, since even Viko concedes it has no Vermont contacts independent of those maintained by WV, Inc.

Finally, without the Vermont contacts required by due process, there is no need to determine separately whether the exercise of general jurisdiction would be reasonable in this case. See Bechard, 810 F. Supp. at 585; Helicopteros, 466 U.S. at 418-419 (relying solely on lack of minimum contacts to reverse lower court's assertion of personal jurisdiction).


## II.  Jurisdictional Discovery is Not Warranted

I also find that limited discovery on the jurisdictional issue would not be productive in this case.  First, while Viko expressed his obvious preference for discovery over dismissal in his Response to World Vision's Motion to Dismiss and at oral argument, he has not technically moved for leave to take jurisdictional discovery.  As a result, this issue has not been the subject of any pleadings before the

Court, and legal argument as to whether Viko is entitled to discovery and, if he is, to what extent discovery should be permitted, is virtually nonexistent.[22]

There is no precise standard in the Second Circuit to determine when a plaintiff is entitled to discovery on the issue of personal jurisdiction. In <u>Jazini v. Nissan Motor Co., Ltd.</u>, 148 F.3d 181, 186 (2d Cir. 1998), the court found that a district court did not err in denying discovery because the plaintiffs "did not establish a prima facie case that the district court had jurisdiction over" the defendant. However, the Circuit has since suggested that district courts may be obligated to order jurisdictional discovery based on a lesser showing, in particular when the plaintiff fails to allege legally sufficient facts to establish jurisdiction, but nonetheless asserts specific, non-conclusory facts that, if further developed, could demonstrate substantial state contacts. <u>See</u> <u>Texas Intern. Magnetics, Inc. v. BASF</u>

_____

[22] In his Response in Opposition to World Vision's Motion to Dismiss, Viko noted only that, "In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway," and "it may permit discovery in aid of the motion." (Doc. 9 at 12).

<u>Aktiengesellschaft</u>, 31 Fed. Appx. 738, 739 (2d Cir. 2002) (Not Reported). Other Circuits have said that jurisdictional discovery is not appropriate unless "the plaintiff [has] at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." <u>FC Inv. Group LC v. IFX Markets, Ltd.</u>, 529 F.3d 1087, 1092 (D.C. Cir. 2008).

Aside from Viko's conclusory assertion that WV, Inc. derives "substantial benefits from marketing and fundraising conducted in Vermont" (Doc. 9 at 8), he does allege specific facts upon which his theory of jurisdiction is based. But even if these facts require a more forgiving standard, Viko has not alleged facts that, if further developed with greater detail, could in any realistic likelihood justify the assertion of general personal jurisdiction over WV, Inc.

In other words, with the Vermont contacts alleged at this point, Viko has not made the "sufficient start" towards establishing jurisdiction that warrants the further costs and delay of jurisdictional discovery. <u>Uebler v. Boss Media AB</u>, 363 F. Supp. 2d 499 (E.D.N.Y. 2005) (internal citation omitted); <u>Kiobel v. Royal</u>

<u>Dutch Petroleum Co.</u>, 2008 WL 591869, *10 (S.D.N.Y. 2008) (Not Reported).  All that could be learned from a further investigation of these facts is that WV, Inc.'s website serves as an actual contact with this state because Vermonters use the site to make donations or sponsor children in need overseas.  But with only a nationally syndicated news program and a registered agent as additional contacts with Vermont, the quality and quantity of such online transactions would have to be particularly substantial to support personal jurisdiction for a completely unrelated cause of action.  This Court and this Circuit have found mere sales-the for-profit analog of receiving donations-to be an insufficient basis for general jurisdiction. <u>See</u>, <u>e.g.</u>, <u>Metropolitan Life</u>, 84 F.3d at 577-588 (noting that the defendant's "$4 million dollars in sales in Vermont . . . standing alone, may not have been sufficient" to find general jurisdiction); <u>Dearwater v. Bond Manufacturing Co.</u>, 2007 WL 2745321, at *7 (D. Vt. Sept. 19, 2007) (rejecting an assertion of general jurisdiction, in part, because the defendant "does not have significant contacts with Vermont apart from its sales."); <u>see also</u> <u>Hy Cite</u>, 952 F. Supp. at

1161 (explaining that in order for a website to justify general jurisdiction it must specifically target residents of the forum, as opposed to rendering the defendant generally accessible regardless of location).

In short, Viko clearly has not made a prima facie showing of jurisdiction, nor has he provided any basis for the good faith belief that further discovery will establish the contacts required before this Court may exercise general jurisdiction over a foreign defendant.[23]

### III. **Forum Non Conveniens**

In addition to lack of personal jurisdiction, both WV Int'l and WV, Inc. move to dismiss based on the common law doctrine of *forum non conveniens*. (Doc. 5 at 9). *Forum non conveniens* allows a federal court to dismiss an action even when the court has proper venue when "the forum chosen by the plaintiff is so completely inappropriate and inconvenient that it is better to stop the litigation in the place where brought and let it start all over again somewhere

---

[23]     To be sure, Viko could also conduct discovery on the relationship between World Vision, Inc. and World Vision International.  But that would only be relevant after finding that WV, Inc. is subject to jurisdiction in this Court in the first place.

else." <u>Grammenos v. Lemos</u>, 457 F.2d 1067, 1074 n.5 (2d Cir. 1972). However, since the enactment of 28 U.S.C. § 1404(a), "the federal doctrine of *forum non conveniens* has continuing application only in cases where the alternative forum is abroad." <u>American Dredging Co. v. Miller</u>, 510 U.S. 443, 449 n.2 (1994); <u>Capital Currency Exch. v. Nat'l Westminster Bank</u>, 155 F.3d 603, 607 (2d Cir. 1998).[24] Here, the defendants argue that Mozambique provides a suitable alternative forum. (Doc. 5 at 9).

In this case, reliance on *forum non conveniens* is not appropriate since the Court lacks personal jurisdiction over the defendant and venue is therefore improper. 28 U.S.C. § 1391; <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 506 (1947). By finding no personal jurisdiction over World Vision, the options in this case are already reduced to either dismissing the case or transferring it to another district court, and a consideration of *non conveniens* would neither expand those options nor influence the choice between them.

---

[24] Some courts have held that in rare circumstances dismissal under *forum non conveniens* is appropriate when the alternate forum is a state court. <u>See</u>, <u>e.g.</u>, <u>Brice v. C.R. England, Inc.</u>, 278 F. Supp. 2d 487 (E.D.Pa. 2003). In this case, the defendants have not offered an alternate state forum, therefore this possibility is not present here.

See 14 U.S.C. § 1406(a).

In any event, the Court notes that *forum non conveniens* could not be an appropriate vehicle for dismissal in this case because World Vision has not met its burden of establishing that a presently available and adequate alternative forum exists. Abdullahi v. Pfizer, Inc., 2009 WL 214649, *19 (2d Cir. 2009); Gross v. British Broad. Corp., 386 F.3d 224, 230 (2d Cir. 2004) (citing Iragorri v. United Techs. Corp., 274 F.3d 65 (2d Cir. 2001) (en banc)). Quite to the contrary, Viko has offered evidence, as it was his initial burden to do, that the Mozambican judicial system is plagued by corruption, and that "enforcement of contracts and legal redress cannot be assured" through Mozambican courts. (Doc. 9-3 at 56-57). Further, World Vision is quite candid in its ignorance of Mozambique law and what legal standards, "if any," would apply in this case. (Doc. 5 at 10).

Under Second Circuit law, a forum may be inadequate "if it does not permit the reasonably prompt adjudication of a dispute, if the forum is not presently available, or if the forum provides a remedy so clearly unsatisfactory or inadequate that it is

tantamount to no remedy at all." <u>Abdullahi</u>, 2009 WL

214649 at *19.  Based on the uncontradicted evidence

submitted by Viko, the proposed alternative forum of

Mozambique is clearly inadequate under this standard.

### IV. **Transfer of Venue**

Without personal jurisdiction over either of the

defendants, this lawsuit cannot proceed in Vermont.

However, rather than dismissing the case, the Court is

statutorily authorized to transfer this matter to "any

district or division in which it could have been

brought" if "it be in the interest of justice" to do

so.  28 U.S.C. § 1406(a); <u>American Wholesalers</u>

<u>Underwriting, Ltd. v. American Wholesale Ins. Group,</u>

<u>Inc.</u>, 312 F. Supp. 2d 247, 259 (D. Conn. 2004);

<u>Goldlawr, Inc. v. Heiman</u>, 369 U.S. 463, 466 (1962).

This case clearly could have been brought in the

Central District of California where both defendants

are headquartered[25] and are thus amenable to judgment.

(Doc. 5 at 9).  And since Viko is a resident of

---

[25]    The Court notes that World Vision, Inc.'s principal place of
business is apparently in Federal Way, WA.  (Doc. 5-2 at 8).  However,
in its Motion to Dismiss World Vision represented to the Court that the
Central District of California is "the location of both entities'
headquarters[.]" (Doc. 5 at 9).  In either case, WV, Inc. is organized
under California law.

Vermont, diversity would be complete in California as well.

Further, the Court finds that it is in the interest of justice to transfer rather than dismiss this case.  Viko was not unreasonable to seek venue in Vermont, and he did not do so out of bad faith.  Instead, he pursued this matter here because he is a Vermont resident seeking redress for his injuries in the most convenient forum possible.  Moreover, World Vision will not be prejudiced since its notice of this litigation is clearly evidenced by its appearance to contest venue and jurisdiction.  <u>American Wholesalers Underwriting</u>, 312 F. Supp. at 259-260.

Accordingly, I recommend that this case be transferred to the Central District of California pursuant to 28 U.S.C. § 1406(a).

## Conclusion

This case belongs in California.  The Court is not unsympathetic to Paul Viko's current situation as a Vermont resident in his seventies who suffered very serious physical injuries.  But these injuries occurred in Mozambique, where Viko went voluntarily and without any reasonable expectation that whatever calamity may

befall him could be remedied in the state of Vermont—legally, medically, or otherwise.  And, in my view, this particular case cannot be pursued in Vermont without violating the constitutional rights of both of the named defendants.

Viko's counsel has admirably advanced every conceivable theory and argument on his behalf, but ultimately Viko simply cannot allege the Vermont contacts necessary to satisfy due process.  And even with sufficient contacts assumed, he must still show that World Vision International should share whatever "consent" or "contact" is attributable to World Vision, Inc.  Obviously, I do not reach the merits of Viko's argument on that point in this recommendation.

If this is a close case at all, it is only as to whether an order for jurisdictional discovery would be appropriate.  Here, there is no reasonable expectation that discovery would be fruitful, and thus there is no reason to waste further time and resources when the case could proceed immediately in California.

Accordingly, I recommend that the Defendants' Motion to Dismiss (Doc. 5) be DENIED, but that their Motion to Transfer (Doc. 26) be GRANTED, and that this

matter be TRANSFERRED to the Central District of California pursuant to 28 U.S.C. § 1406(a).

Dated at Burlington, in the District of Vermont, this 27<u>th</u> day of <u>April</u>, 2009.

<u>/s/ John M. Conroy</u>
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. Failure to file objections within the specified time waives the right to appeal the District Court's order. <u>See</u> Local Rules 72.1, 72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).